Dennis M. Elber, Esq., SBN: 70746
STOLPMAN, KRISSMAN, ELBER & SILVER LLP
111 W. Ocean Boulevard
Suite 1900
Long Beach, CA 90802
Telephone: (562) 435-8300
Facsimile: (562) 435-8304

Attorneys for Plaintiff, JOHN MALAHNI

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MALAHNI,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>APOLLO NAVIGATION CORP; VESSEL M.V.; HYUNDAI INDEPENDENCE; ZODIAC MARITIME AGENCIES LTD; HYUNDAI HEAVY INDUSTRIES CO., LTD. and DOES 1 through 100, Inclusive,<br><br>　　　　Defendants. | CASE NO.: 2:15-cv-00473-PSG-MRWx<br>Hon. Philip S. Gutierrez<br><br>PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW<br><br>Pretrial Conference Date: January 11, 2016<br>Time: 2:30 p.m.<br><br>Trial Date: February 2, 2016 |

To the above-entitled Court and to all parties and to their respective attorneys of record:

COMES now, Plaintiff, JOHN MALAHNI, pursuant to this Court's Scheduling Order, and hereby submits the following Memorandum of Contentions of Fact and Law.

Dated: December 22, 2015      STOLPMAN, KRISSMAN, ELBER & SILVER LLP

　　　　　　　　　　　　　　　By: _/s/ Dennis M. Elber_____
　　　　　　　　　　　　　　　　　DENNIS M. ELBER,
　　　　　　　　　　　　　　　　　Attorneys for Plaintiff,
　　　　　　　　　　　　　　　　　JOHN MALAHNI

Plaintiff is a longshoremen who has plead and pursues claims arising out of section 905(b) of the LHWCA, which provides a longshoreman with the right to recover damages caused by the negligence of a vessel. *Scindia Steam Ship Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981). As used in the LHWCA, the term "vessel" is defined to include the ship's "owner, owner pro hac vice, agent, operator, charterer or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). As the operator/manager of the Vessel, defendant Zodiac Maritime Agencies, LTD (ZMA) is one of the entities contemplated by the definition of "vessel." *Id.*

Section 905(b)'s negation of a vessel's liability for unseaworthiness was not intended "'to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition' as long as the vessel was not 'chargeable with the negligence of the stevedore or employees of the stevedore.'" *Scindia Steam Navigation Co.*, 451 U.S. at 166 n.13 (quoting S. Rep. No. 92-1125, p. 10, 11(1972)). See also, *Kirsch v. Plovidba*, 971 F.2d 1026,1029 (3d Cir. 1992) ["*Scindia* does not cast any doubt on the shipowner's duty to inspect the ship for hazards before turning the ship over to the stevedore, because inspection is integral to providing the stevedore with a reasonably safe workplace, a duty that *Scindia* explicitly recognized."].

Pursuant to *Scindia* and its progeny, ZMA owed four separate duties of care to protect plaintiff from hazards he might encounter while loading and unloading the Vessel. These are the "turnover duty," "the turnover duty to warn," the "active control duty," and the "duty to intervene." *Scindia, supra*, 451 U.S. 156; *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994); *Torres v. Johnson Lines*, 932 F.2d 748, 750 (9th Cir. 1991).

**Claim 1: The turnover duty of safe condition**: The ship can not turn over the vessel with an unsafe condition. *Torres v. Johnson Lines, supra*, 932 F.2d at 750 (9th Cir. 1991). The "turnover duty" and "turnover duty to warn," concern the "condition of the ship upon the commencement of stevedoring operations." *Howlett, supra*, 512 U.S. at 98. The turnover duty is implicated only where the vessel has failed to exercise ordinary care

prior to commencement of cargo operations. *Kirsch v. Plovidba*, 971 F.2d 1026, 1029 (3rd Cir. 1992). A vessel must exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on its cargo operations with reasonable safety to persons and property. *Howlett, supra*, 512 U.S. at 98. This means that "certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them." *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1208 (9th Cir. 1988)

**Brief Description of Key evidence in support of Claim 1:**

1) The subject turnbuckle was not in use attached to a cargo container when the ship arrived in Los Angeles on October 26, 2011.

2) The subject turnbuckle's unique location on the ship superstructure identifies it as one to be used on ship equipment, not cargo containers.

3) The subject turnbuckle's unique location makes it not well situated to use for attachment to cargo containers.

4) There is no evidence in the ship's documents that the subject turnbuckle was attached to a container when the ship arrived in Los Angeles on October 26, 2011.

5) There is no testimony from any of the ship's crew members that the subject turnbuckle was attached to a container when the ship arrived in Los Angeles on October 26, 2011.

6) The subject turnbuckle was not properly stored on the ship's superstructure before the commencement of cargo operations and could not be safely worked around because the latent dangerous hazard, the improperly secured turnbuckle, was caused to dislodge by the tremendous physical forces imposed on the ship superstructure by the cargo operations.

7) As part of its final safety check, it is the obligation of the ship to determine that turnbuckles are being stored correctly before the ship is turned over to the stevedores for its cargo operations in a reasonably safe condition.

8) A reasonably safe condition requires that the turnbuckles that are not attached to cargo containers be inspected by the ships personnel to determine that they are safely secured to the proper securing mechanism on the ship superstructure before the ship is turned over to the stevedores.

9) There is no evidence in the ship's documents that any inspection was done before the ship was turned over to the stevedores for the commencement operations.

10) The only testimony from any crew member is a 2011 declaration from the chief mate that he did an inspection prior to the turnover. However, there is nothing in his declaration that he inspected any turnbuckles, let alone the subject turnbuckle. Further, he was effectively second in command to the Captain of the vessel and it is unlikely that such a high ranking office would be responsible for check the security of turnbuckle connections whether stored or in use.

11) The design and location of the subject turnbuckle/securing hook along with damage to the catwalk rail impacted the ability to safely secure the subject turnbuckle on its attendant securing hook.

12) The danger created by the placement of the subject turnbuckle on its attendant securing hook before commencement of cargo operations was not open and obvious; was in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should expect to encounter, arising from the hazards of the ship's service or otherwise, was not able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property; this condition constituted a latent defect.

13) **DAMAGES**: As a result of defendant's negligence, plaintiff was caused to suffer serious injury to his physical and emotional health, preventing him from continuing to work in his $250,000 a year job as a longshore foreman and all gainful employment due to his cognitive impairment and his right lower extremity paralysis. Plaintiff was rendered unconscious by the blunt force trauma of the turnbuckle on October 27, 2011. On the date of the subject accident Mr. Malahni was transported by ambulance to the emergency department at St. Mary's Medical Center because of a head injury with a 20 minute loss of

consciousness. A neurosurgical consult indicated Glascow scores of 6, improving to 9 and then 13. He was admitted to the acute rehabilitation service on 11/4/11, where persistent cognitive deficits were noted. He received multimodal acute brain-Injury rehabilitation treatments (P.T.,O.T.,Speech/cognitive). Neuropsychological evaluation of 11/14/11 revealed pervasive deficits. Specifically, he reported orientation was mild to moderately impaired, patient became dysarthric when fatigued or stressed. He suffered from symptoms of depression and anxiety with decreased appetite and sleep. He had decreased concentration probably influenced by fatigue and headaches. Auditory and visual attention was severely (1" percentile) impaired. Verbal fluency was impaired (1st percentile) and the patient became dysfluent when anxious, stressed or fatigued. Delayed visual memory was impaired (1" percentile) and visual perception was low average. Learning and memory of words was low borderline (2nd percentile). Executive functioning was variable-from impaired to borderline to normal. Processing speed was impaired. Neuropsychological evaluation of 12/13/11, just prior to Mr. Malahni's discharge from hospitalization revealed improved cognitive functioning but ongoing cognitive deficits the claimant's discharge from acute rehabilitation. Plaintiff has Brain Concussion Syndrome, 2) Cognitive difficulties and underlying depression, 3) chronic headaches since time of injury, 4) gait instability and ataxia, primarily involving the right lower extremity, 5) post traumatic stress disorder.

**Claim 2: The turnover duty to warn:** The vessel owner must warn the stevedore of "any hazards on the ship or with respect to its equipment" that (a) are known or should be known to the vessel owner in the exercise of reasonable care, (b) are likely to be encountered by the stevedore in the performance of her duties, and (c) are not known by the stevedore, nor would they be obvious or anticipated by a "reasonably competent" stevedore. *Howlett v. Birkdale Shipping Co.*, 512 U.S. at 98. "The vessel's responsibilities to inspect ... the ship are commensurate with its access and control." *Id.* at 104. "Any hazard uncovered by a shipowner who inspects a completed stow would, as a matter of course, be discovered in a subsequent port by a stevedore reasonably competent in the

performance of his work. As discussed above, shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow. Once loading operations are complete, it follows that any dangers arising from an improper stow would be at least as apparent to the stevedore as to the shipowner. Because there can be no recovery under § 5(b) for a vessel's failure to warn of dangers that would be apparent to a longshoreman of reasonable competence, nothing would be accomplished by imposing a duty upon vessels to inspect the stow upon completion of cargo operations." *Id.* "For the purposes of delineating the scope of a shipowner's turnover duty, then, the cargo stow is separate and distinct from other aspects of the ship." *Id.* "The vessel's responsibilities to inspect these areas of the ship are commensurate with its access and control, bearing in mind, of course, that negligence, rather than unseaworthiness, is the controlling standard where longshoremen are concerned. Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, its duties with respect to the stow are limited by comparison." *Id.*, at 104-105. Of course, even if the defect that the ship failed to correct prior to commencement of cargo operations was open and obvious "the shipowner has no defense that the hazard was ... open and obvious ..., and that longshoreman's own knowledge of a shipboard hazard will not negate a shipowner's duty of care which would exist otherwise. We have followed that rule repeatedly, and we do so again today." *Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 166-67 (5th Cir.1990). "We have generally applied this exception [to the open and obvious defense] where the dangerous condition existed in the ship's equipment or was otherwise created by the shipowner through its negligence." *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 396 (5th Cir.2008).

**Brief Description of Key evidence in support of Claim 2**

Plaintiff incorporates 1-13 above and adds:

14) Because the subject turnbuckle was not in use on a cargo container before the commencement of cargo operations but remained stored on the ship's superstructure the

1  vessel owner knew or should have known that the subject hazard was likely to be
2  encountered by the stevedore during cargo operations.
3  15)   The subject hazard was not known by the stevedore.
4  16)   The subject hazard would not be obvious to or one that the longshoreman should
5  have anticipated.

**Claim 3: The Active Control Duty:** "A shipowner may be held liable under *Scindia* if the shipowner actively involves itself in the cargo operation or fails to exercise due care to avoid exposing longshoremen to hazards in an area or from equipment under the vessel's active control. The Court in *Scindia* held that the vessel's duty to the longshoreman [does not] require[ ] the shipowner to inspect or supervise the stevedoring operation. *Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore.* 451 U.S. at 168, 101 S.Ct. at 1622–23." *Taylor v. Moram Agencies*, 739 F.2d 1384, 1387 (9th Cir. 1984) (emphasis added by 9th Cir.). "Recent circuit court decisions accord with the Scindia requirement of active control by the vessel over the equipment or areas in question. See *Sarauw v. Oceanic Navigation Corporation*, 655 F.2d 526 (3d Cir.1981) (gangway to vessel, supplied by stevedore, held not an appurtenance within the confines of cargo operation) and *Davis v. Partenreederei M.S. Normannia*, 657 F.2d 1048 (9th Cir.1981) (longshoreman injured by cargo discharged in close proximity to gangway held to have action for negligence based on shipowner's concurrent control of the gangway). The Third Circuit specifically held that the ship had maintained control over the manner in which the gangway was to be secured, an "essential appurtenance of the ship," rather than equipment strictly within the confines of the cargo operation. *Sarauw*, 655 F.2d at 529. This active control over the area or equipment utilized in the cargo operation is distinct from the casual use of the deck by the ship's crew for passage or activities undertaken by the crew at the specific request of stevedore personnel." *Taylor v. Moram Agencies*, supra, 739 F.2d at 1387.

///

**Brief Description of Key evidence in support of Claim 3**

Plaintiff incorporates 1-16 above and adds

17) The subject turnbuckle and securing hook was an essential appurtenance of the ship and the subject railing and catwalks were not equipment strictly within the confines of the cargo operation.

18) The ship's crew had active control over the subject area and equipment as evidenced by their ongoing inspections during the cargo operations.

**Claim 4: The Duty to intervene.** A shipowner has a duty to intervene "where a shipowner (1) has actual or constructive knowledge of a dangerous condition, (2) knows that the longshoremen are continuing to work despite the existence of an unreasonable risk of harm to them, and (3) could not reasonably expect that the stevedore would remedy the situation. 451 U.S. at 175–176, 101 S.Ct. at 1626–1627." *Taylor v. Moram Agencies*, supra, 739 F.2d at 1387-1388. "It is further required that a part of the ship itself, the ship's "gear," cause the injury. Such a limitation effectively prevents the misallocation of costs feared by the Scindia Court, since it seems that in this specific circumstance the owner is in as good a position as the stevedore to prevent an accident. While the stevedore is in control of the loading operations, the "vessel" runs the ship itself." *Carpenter v. Universal Star Shipping S.A.*, 924 F.2d 1539, 1543 (9th Cir. 1991). "The [*Bandeen v. United Carriers, Inc.*, 712 F.2d 1336 (9th Cir.1983)] court noted that in those cases in which a duty to intervene had been found either the ship's gear had caused the injury, or the shipowner had affirmatively acted to assume the duty. *Bandeen*, 712 F.2d at 1340. We found no duty to intervene in *Bandeen* because, "... the shipowner's equipment and acts did not cause the injury. *Id.*" *Carpenter v. Universal Star Shipping S.A.*, 924 F.2d at 1543.

**Brief Description of Key evidence in support of Claim 4**

Plaintiff incorporates 1-18 above and adds:

19) The longshoremen continued to work despite the existence of the unreasonable risk of harm to them caused by the hazard of which the ship had actual or constructive notice.

20) The ship could not reasonably expect that the stevedore would remedy the situation

because the ship knew that it involved a latent condition involving the ship's gear and not cargo stow.

Dated: December 22, 2015        STOLPMAN, KRISSMAN, ELBER & SILVER LLP

By: _____
    DENNIS M. ELBER,
    Attorneys for Plaintiff,
    JOHN MALAHNI

F:\FILES\MALAHNI, John\FEDERAL CASE\Trial\Memo of Conten of Fact & Law.wpd

1  **MALAHNI v. APOLLO NAVIGATION CORP, et al**
   United States District Court Case Number: 2:15-cv-00473-PSG (MRWx)
2  Assigned to Hon. Philip S. Gutierrez

3

| Bradley M. Rose, Esq.<br>Frank C. Brucculeri, Esq.<br>Daniel F. Berberich, Esq.<br>KAYE, ROSE & PARTNERS, LLP<br>9100 Wilshire Boulevard<br>Suite 420W<br>Beverly Hills, California 90212<br>Telephone: (310) 551-6555<br>Facsimile: (310) 277-1220<br>E-Mail: fbrucculeri@kayerose.com | Attorneys for Plaintiffs, ZODIAC MARITIME AGENCIES, LTD. and the M/V HYUNDAI INDEPENDENCE |
|---|---|
|  |  |

PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action; my business address is: 111 W. Ocean Boulevard, Suite #1900, Long Beach, California 90802.

On the date set forth below, I served the foregoing document(s):

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

[ ] BY MAIL as follows: I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, all mail is deposited with the U.S. Postal Service on the same day with postage thereon, fully prepaid at Long Beach, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postage meter date is more than one day after date of deposit for mailing in the affidavit. See attached mailing list for addressee(s).

[ ] BY PERSONAL SERVICE: I caused a true and correct copy thereof enclosed in a sealed envelope, to be delivered by hand to the addressee(s) listed on the attached mailing list.

[ ] BY OVERNIGHT COURIER: I caused the above-referenced document to be delivered to an overnight courier service (FED EX, UPS, U.S.P.S. Express Mail, etc.) for delivery to the addressee(s) listed on the attached mailing list.

[ ] BY FACSIMILE TRANSMISSION: I caused the above-referenced document to be transmitted to the addressee(s) at the facsimile number listed on the attached mailing list.

[X] BY E-MAIL/ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission [ECF NEF], I caused the above-referenced document to be transmitted to the person at the e-mail address listed on the mailing list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X] (State) I declare under penalty of perjury, pursuant to the laws of the State of California, that the above is true and correct.

[X] (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction this service was made.

Executed this 22th day of December 2015, at Long Beach, California.

Daisy M. Torres, Declarant